# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                       Case No. 06-CR-273

**JON M. BARTLETT**
        **Defendant.**

## DECISION AND ORDER

Defendant Jon Bartlett moves for modification of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I deny his motion.

## I. FACTS AND BACKGROUND

The facts of the case are set forth in the opinion of the court of appeals on Bartlett's direct appeal:

> Andrew Spengler held a housewarming party that started on October 23 and lasted into the next morning. Spengler and many guests were police officers. Liquor flowed freely. Katie Brown and Kirsten Antonissen were among the invitees. They arrived after 2:30 AM on October 24 with Frank Jude and Lovell Harris. The quartet was immediately made to feel unwelcome because the women are white, and the men are not. (Harris describes himself as black; Jude describes himself as bi-racial.) After five minutes, the four prepared to leave—but they were prevented when at least ten men stormed outside, surrounded Antonissen's truck, and demanded to know what the four new arrivals had done with Spengler's badge. Spengler says that he could not find it after the quartet arrived, and he accused them of theft. The men demanded that the four get out of the truck and surrender the badge. When they stayed inside, the men threatened them ("Nigger, we can kill you") and began to vandalize the truck. Harris tried to wake the neighbors; the men responded: "Nigger, shut up, it's our world."
>
> Eventually all four were dragged from the truck. A search did not turn up the badge. Instead of concluding that Spengler's accusation was mistaken, the men became enraged and violent. One cut Harris's face in a way that he described as

"slow and demented." Harris managed to free himself and run away. Multiple men began to kick and punch Jude. Antonissen managed to call 911; she told the operator "they're beating the shit out of him." When the men saw Antonissen use the phone, they wrested it from her hand and flung her against the truck so forcefully that its metal was dented. Brown made two calls to 911 before her phone, too, was seized.

The first call was logged at 2:48, and two officers (Joseph Schabel and Nicole Martinez) arrived at 3:00. The beating continued until their appearance. Men punched Jude's face and torso; when he fell to the ground, they kicked his head and thighs. The partygoers behaved as a mob. Not a single person in the house tried to stop the attack or even to call for aid. Jon Clausing, who had slashed Harris's face, explained his conduct as "just kind of going along with everybody." That is the way of the mob. Society has police forces to pose a counterweight to mobs, yet here the police became a mob.

Schabel and Martinez were on duty and had not been drinking, so they should have put a stop to the violence. Instead Schabel joined it, while Martinez watched. On being told that Jude had stolen Spengler's badge, Schabel called Jude a "motherfucker" and stomped on his face until others could hear bones breaking. After telling Martinez "I'm really sorry you have to see this," Daniel Masarik picked Jude off the ground and kicked him in the crotch so hard that his body left the ground. Jon Bartlett then took one of Schabel's pens and pressed it into each of Jude's ear canals, causing severe injury and excruciating pain. The men also broke two of Jude's fingers by bending them back until they snapped. Spengler put a gun to Jude's head and said: "I'm the fucking police. I can do whatever I want to do. I could kill you." Bartlett used a knife to cut off Jude's jacket and pants, leaving him naked on the street in a pool of his own blood.

The violence tapered off when additional on-duty police arrived. At 3:09 officers arrested Jude. Yes, they arrested the victim, although Jude had never fought back. (He had suffered a concussion and was unable to defend himself.) Jude was taken to an emergency room; the admitting physician took photographs because "[t]here were too many [injuries] to document" in writing. The injuries to Jude's ears could not be diagnosed because the physicians could not control the bleeding. One physician testified that she had never seen ear injuries so severe. While Jude was receiving treatment, on-duty officers recovered Jude's car. Bartlett and other men had ripped up its seats with knives and poured antifreeze over them; apparently they poured antifreeze into the gas tank too, damaging the engine. The radio had been wrecked. The men broke a headlight and tore a mirror off Antonissen's truck. Spengler's badge was not found in either the car or the truck; perhaps he had put down the badge in the house and was too soused to remember where.

Bartlett, Spengler, and Masarik were prosecuted in state court and acquitted after

> Schabel and others committed perjury on their behalf, while many people who had been at the party claimed to suffer memory loss. That made it impossible to show who had done what, and the judicial system (unlike a mob) demands personal responsibility. The Civil Rights Division of the Justice Department then investigated, and federal prosecutors persuaded several witnesses to cooperate. Four men (Joseph Schabel, Ryan Lemke, Jon Clausing, and Joseph Stromei) pleaded guilty to obstruction of justice (by perjury, including false testimony before the federal grand jury), to violating Harris's and Jude's civil rights, or both. Bartlett, Spengler, and Masarik were convicted by a jury of conspiring to violate Harris's and Jude's right to be free from unreasonable searches and seizures (18 U.S.C. §241), and of the substantive offense (18 U.S.C. §242). . . . Bartlett was sentenced to 208 months' imprisonment, Spengler and Masarik to 188 months apiece.

United States v. Bartlett, 567 F.3d 901, 903-05 (7th Cir. 2009).

The court of appeals affirmed Bartlett's convictions but vacated his sentence based on a possible misreading of the guideline table:

> Bartlett's sentence of 208 months . . . exceeds the top of his [guideline] range. He committed the most brutal acts. Thrusting a pen into a person's ear canals is torture by any definition. While facing the state charges, Bartlett threatened to blow up his former police station, a crime for which he has been convicted in state court and sentenced to 54 months. He also defrauded a gun dealer into selling him a submachine gun, violating gun-control laws as well as the terms of his federal bail; this conduct drew another 18 months in a separate prosecution. A district judge might deem a lengthy consecutive sentence essential for incapacitation as well as deterrence and desert. But the court may not have appreciated that Bartlett's sentence exceeds his Guideline range.
> . . .
> Bartlett's range is 151 to 188 months. Much of the sentencing transcript reads as an explanation about why the sentence is at the high end of the range. At the end of the proceeding, the judge stated bluntly that the sentence would be the top of the range. But the actual sentence of 208 months is 20 months higher. That's a problem.
>
> The prosecutor says that, by the close of the proceeding, the judge had recognized that 208 months exceeds Bartlett's range. The transcript is not as clear to us as it appears to be to the prosecutor. Given the risk of confusion, the better part of wisdom is to ask the district judge to take another look, to ensure that the sentence rests on a deliberate choice rather than a mistake. A 208-month sentence is reasonable substantively, but no one, not even a Bartlett, should lose 20 months of freedom because a district judge read across the wrong line in a table.

3

Id. at 909-10.

On remand, Judge Clevert re-imposed the 208 month term, running consecutively to the other sentences. Bartlett appealed again, but this time the Seventh Circuit affirmed. United States v. Bartlett, 370 Fed. Appx. 714 (7th Cir. 2010). Bartlett is currently serving his sentence at FCI Danbury, with a projected release date of August 20, 2022.

On April 13, 2020, Bartlett filed the instant motion for sentence reduction. (R. 299.) I referred the motion to Federal Defender Services pursuant to the court's standing order (R. 300), but FDS declined to supplement the filing (R. 302). Bartlett then filed his own motion for appointment of counsel. (R. 303.) I noted that Bartlett's motion thoroughly laid out the law and the facts pertinent to his request and thus saw no need to appoint counsel prior to obtaining a response from the government. However, I deferred ruling on the motion to appoint until after reviewing the government's response, which I directed be filed by May 4, 2020. (R. 304.)

On May 4, 2020, the government requested a short extension of time. The government indicated that, according to the BOP, on April 4, 2020, Bartlett made a request for compassionate release to the warden at FCI Danbury, which was denied on April 23, 2020. (R. 305 at 2.) BOP further advised that Bartlett's case had been presented to the central office for consideration of release to home confinement under the CARES Act. Because that consideration might render the issues raised in Bartlett's motion moot, the government sought a short continuance. (R. 305 at 3.) I granted the request, extending the deadline to May 12, 2020. (R. 306.)

On May 12, 2020, the government filed its response, arguing that Bartlett's motion should be denied on the merits. (R. 309.) With the response, the government submitted for filing under seal approximately 165 pages of medical records. (R. 310.) On May 13, 2020, the

4

government filed a letter indicating that home confinement for Bartlett had been denied. (R. 311.) On May 18, 2020, Bartlett filed a reply and renewed request for appointment of counsel. (R. 313.) The matter is ready for decision.

## II. DISCUSSION

### A. Compassionate Release Standards

Prior to the passage of the First Step Act of 2018, only the Bureau of Prisons could move for an inmate's "compassionate release" under 18 U.S.C. § 3582(c)(1)(A). See, e.g., United States v. Schneider, No. 14-cr-30036, 2020 U.S. Dist. LEXIS 88548, at *4 (C.D. Ill. May 20, 2020). The statute now permits the court to modify a term of imprisonment upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). On the merits, the court may grant relief, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable, if it finds that "extraordinary and compelling reasons" warrant such a reduction and that such a reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

Section 3582(c)(1)(A) does not define the term "extraordinary and compelling reasons." Rather, Congress directed the Sentencing Commission, in promulgating general policy statements regarding the sentencing modification provisions in § 3582(c)(1)(A), to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The

5

Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)   (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement provides that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> > >
> > > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

6

>   (C) Family Circumstances.—
>
>>   (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>>
>>   (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
>   (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act. See United States v. Garcia, No. 4:05-cr-40098, 2020 U.S. Dist. LEXIS 75335, at *6-7 (C.D. Ill. Apr. 28, 2020). Courts have debated whether § 1B1.13 still controls when the defendant seeks relief on his own motion.

In United States v. Scott, No. 17-CR-156, 2020 U.S. Dist. LEXIS 85554, at *17-18 (E.D. Wis. May 15, 2020), I adopted what appears to be the majority position—that the court in deciding a compassionate release motion is no longer confined to the specific examples enumerated in the policy statement. Giving the statutory terms their ordinary meaning, a defendant seeking compassionate release would need to demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. Id. at *20; see also United States v. Ramirez, No. 17-10328-WGY, 2020 U.S. Dist. LEXIS 83363, at *6 (D. Mass. May 12, 2020) ("The policy contained in section 1B1.13 serves as helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.")

(internal quote marks omitted); United States v. Pinto-Thomaz, No. 18-cr-579, 2020 U.S. Dist. LEXIS 64444, at *4-5 (S.D.N.Y. Apr. 13, 2020) (holding that the court may grant compassionate release motions on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in application note 1 to U.S.S.G. § 1B1.13).

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that compassionate release would undermine the goals of the original sentence. See, e.g., United States v. Daugerdas, No. 09cr581, 2020 U.S. Dist. LEXIS 77658, at *9 (S.D.N.Y. May 1, 2020); see also U.S.S.G. § 1B1.13(2) (stating that release may be denied if the defendant would pose "a danger to the safety of any other person or to the community").

## B. Bartlett's Motion for Sentence Reduction

### 1. Exhaustion

In his motion, Bartlett argues that the statute's exhaustion requirements may be waived. (R. 299 at 2-3.) As the government notes in its response, Bartlett made a compassionate

8

release request to the warden, which has been denied. The BOP has also declined to release him to home confinement under the CARES Act. The government takes the position that the court need not address exhaustion and should decide the motion on the merits. (R. 309 at 3.) I agree. See also Scott, 2020 U.S. Dist. LEXIS 85554, at *9-11 (holding that this requirement is not jurisdictional).

### 2. Extraordinary and Compelling Reasons

In his motion, Bartlett relies on the COVID-19 pandemic. He states that he is 48 years old and suffers from a chronic condition known as ulcerative colitis, which renders him autoimmune deficient. He contends that his medical ailments and the conditions of his confinement make him substantially more susceptible to infection. (R. 299 at 3.) He further contends that FCI Danbury has been hit with a COVID-19 outbreak, including among inmates from his housing unit; that prisoners cannot socially distance as needed to slow the spread; and that prison officials have been indifferent to inmate safety. (R. 299 at 3-4.)

Bartlett fails to establish extraordinary and compelling reasons. While the risks posed by the COVID-19 pandemic in prison are relevant in deciding a compassionate release motion, courts have tended to deny motions based on general concerns about possible exposure, Scott, 2020 U.S. Dist. LEXIS 85554, at *22 (citing United States v. Gold, No. 15 CR 330, 2020 U.S. Dist. LEXIS 79539, at *5 (N.D. Ill. May 6, 2020) (collecting cases)), granting relief to prisoners particularly vulnerable to the virus. Id. (citing Ramirez, 2020 U.S. Dist. LEXIS 83363, at *9 (collecting cases)).

Bartlett does not fall within the age group deemed high risk for severe illness from

9

COVID-19 by the CDC.[1] While the CDC does identify persons who are immunocompromised as high risk, Bartlett presents no medical evidence establishing that his ulcerative colitis places him in that category. He asserts that after a January 2020 colonoscopy, his first in many years, the doctor recommended the test be repeated in one year to more closely monitor his condition. (R. 299 at 3.) However, Bartlett does not in his motion indicate that the doctor made any other findings pertinent to his COVID-19 risk.

The records submitted by the government under seal show that Bartlett has received regular medical, vision, and dental care, and I see nothing in those records suggesting that his situation is extraordinary and compelling. Of note, the reports from the January 2020 colonoscopy indicate that while Bartlett had multiple benign polyps removed—and would need a follow up test in one year due to increased cancer risk—there was no evidence of active ulcerative colitis. (R. 310 at 7, 40, 42, 45.) An April 11, 2019, note indicates that Bartlett was diagnosed with ulcerative colitis in 1996, was "doing well from an ulcerative colitis standpoint," and was to be scheduled for a "surveillance colonoscopy." (R. 310-1 at 91.) A June 19, 2019, note indicates: "Good general health." (R. 310-1 at 24.)

In reply, Bartlett contends that he suffers from two conditions that place him at risk. First, he has ulcerative colitis, an auto-immune disorder, treated with sulfasalazine, which is an immune suppressant that can impair liver function. He notes that the BOP has provided him with just two colonoscopies, in 2009 and 2020. During the second procedure, he had a number of polyps removed. (R. 313 at 2.) However, Bartlett does not dispute the indications in the records that the polyps were benign and that there was no evidence of active ulcerative colitis.

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (listing persons 65 and older).

10

(R. 310 at 45.)

Second, Bartlett contends that he has diminished liver function, the cause of which has yet to be diagnosed. (R. 313 at 2.) He attaches lab reports from December 2018 and February 2019, which appear to record a number of high and low findings. (R. 313 attach. 5, 6.) He also attaches a medical note from October 2019, which references an issue with liver function. (R. 313 at 2.) The note states: "Patient had acute elevation of LFE's in December of 2018. He had repeat labs in February, which were slightly improved. Hepatitis profile was normal. Now needs further work-up and surveillance." (R. 313 attach. 7 at 1.) The balance of the exam appears to have been normal, and the doctor indicated that he "needs bowel prep for colonoscopy." (R. 313 attach. 7 at 2.) The doctor also ordered an ultrasound to evaluate his liver due to persistent elevated liver enzymes.[2] (R. 313 attach. 8.) However, that procedure, which had been scheduled for March 2020, was canceled due to COVID-19.[3] (R. 313 at 2.)

Bartlett made no mention of his liver in the initial motion, and arguments made for the first time in reply are generally waived. E.g., Porco v. Trs. of Ind. Univ., 453 F.3d 390, 395 (7th Cir. 2006). Bartlett proceeds pro se, but he fails to explain why, based on conditions at the prison and/or lack of access to records, he could not have at least mentioned his liver problems in the original motion. In any event, even if I overlook the waiver, Bartlett's contentions regarding his liver are too vague and speculative to support relief. He contends that he is prepared to subpoena his doctor to testify concerning his medical condition and medications

---

[2] A December 4, 2019, note indicates: "Patient will need hepatic function surveillance after starting medication." (R. 310-1 at 1.) However, I see nothing in the note mentioning complications, side effects, or immuno-compromise.

[3] The medical records indicate that all non-emergency radiology requests have been canceled due to COVID-19. (R. 310 at 3.)

11

(R. 313 at 3), but there is no right to a hearing in sentence modification proceedings under § 3582(c)(1), see, e.g., United States v. Bulgin, No. 4:15-cr-102, 2020 U.S. Dist. LEXIS 97082, at *3 (D.N.D. June 3, 2020), and Bartlett presents no specific, non-speculative basis for further proceedings. In sum, the record fails to demonstrate that any of defendant's medical conditions render him particularly vulnerable to COVID-19 or are otherwise comparable to the conditions listed in U.S.S.G. § 1B1.13.

Finally, while some courts have also considered the circumstances at the particular facility where the prisoner is confined, e.g., Scott, 2020 U.S. Dist. LEXIS 85554, at *22 n.9, Bartlett fails to establish a basis for his release based on the conditions at FCI Danbury. In his motion, Bartlett claims that FCI Danbury is the "epicenter" of the COVID-19 outbreak within the BOP. (R. 299 at 3.) As of June 8, 2020, the BOP's COVID-19 resource page lists 18 inmates positive, 2 staff positive, 1 inmate death, 0 staff deaths, 80 inmates recovered, and 59 staff recovered at FCI Danbury; 12 other institutions reported more positive inmates than FCI Danbury.[4]

In its response, the government details the measures BOP has taken to control spread of the virus and protect inmate health. (R. 309 at 9-11.) In reply, Bartlett disputes the efficacy of those measures. (R. 313 at 1-3.) He also attaches a decision addressing the conditions at FCI Danbury. (R. 313 attach. 1.) The issue before me is not the effectiveness of the BOP's COVID-19 response or whether Bartlett should be moved to home confinement as part of a broader strategy to combat the pandemic, but whether he has shown that extraordinary and compelling reasons warrant modification of his sentence under § 3582(c)(1)(A)(i). He has not.

---

[4] https://www.bop.gov/coronavirus/ (last visited June 8, 2020).

12

### 3. Section 3553(a) Factors

Even if defendant could establish extraordinary and compelling reasons, I would deny his motion based on review of the pertinent § 3553(a) factors. The nature and circumstances of the offense, see 18 U.S.C. § 3553(a)(1), are set forth in graphic detail above. As the court of appeals noted, Bartlett "committed the most brutal acts" of those who attacked Frank Jude. Bartlett, 567 F.3d at 909 ("Thrusting a pen into a person's ear canals is torture by any definition."). The seriousness of the offense cannot be overstated. See 18 U.S.C. § 3553(a)(2)(A). There is also a strong need to promote respect for the law and to deters other from engaging in such brutality. See 18 U.S.C. § 3553(a)(2)(B). Finally, the record suggests a need to protect the public. See 18 U.S.C. § 3553(a)(2)(C). While on bond, Bartlett committed two additional crimes: making a bomb threat, for which he was sentenced to 54 months, and defrauding a gun dealer, for which he was sentenced to 18 months. Bartlett, 567 F.3d at 909.

In his motion, Bartlett addresses none of these circumstances.[5] Rather, he stresses his clear conduct, completion of programming, employment, and placement in positions of trust while serving his sentence. He contends that he has been a model inmate and has a low probability of re-offending. (R. 299 at 4-5; R. 313 at 3.) He further argues that a sentence of time served, plus a period of supervised release, would be sufficient but not greater than necessary. He indicates that he has served over 85% of his term, and that the sentence has been more punitive due to his status as a former police officer, which has caused him to be assaulted and resulted in his placement in segregation. (R. 229 at 4-5.) He also notes that he

---

[5]In reply, Bartlett states: "The government attributes certain violent acts from the incident 16 years ago to Bartlett when testimony at trial indicated these acts were done by his codefendants." (R. 313 at 3.) However, he does specify those acts.

13

has served more time than other defendants in this case. (R. 313 at 3.)

As the government notes, while Bartlett's conduct while confined is laudable, "notably absent in this recitation is any indication that he has accepted responsibility for the conduct that led to his incarceration or regrets the harm that he caused to the victims of these offenses." (R. 309 at 17.) Perhaps Bartlett's rehabilitative efforts, coupled with his current age, suggest that he no longer poses a danger to the public, as he contends. (See R. 299 at 4-5; R. 313 at 3.) In his request to the warden, Bartlett also notes that he will not be able to work as a police officer in the future, so it will be impossible for him to commit these crimes again; in that filing, he also discusses his plans for employment and housing on release. (R. 309-1.) Nevertheless, even if his release would not endanger the public, the need for the sentence imposed to provide just punishment, promote respect for the law, and deter others remains strong. To the extent that Bartlett will serve more time than the co-actors, given the egregiousness of his actions and his commission of other crimes on bond, there is no unwarranted disparity. See 18 U.S.C. § 3553(a)(6).

**C.     Appointment of Counsel**

There is no right to counsel in a § 3582(c) proceeding, although the court may appoint counsel in the exercise of discretion. United States v. Johnson, 580 F.3d 567, 569 (7th Cir. 2009); United States v. Tidwell, 178 F.3d 946, 949 (7th Cir. 1999). I decline to appoint counsel for Bartlett.

Bartlett's papers demonstrate that he well understands the applicable law, including the manner in which the First Step Act expanded inmates' ability to access the courts with compassionate release claims, the exhaustion issues raised by the statute, the effect of the Commission's outdated policy statement, and the applicability of the § 3553(a) factors. His

14

filings also indicate that he is able to present his claims. Exhaustion is not an issue, and the remaining legal issues are not complex. While the motion raises medical issues, the government has supplied medical records, and there is no indication that Bartlett lacks access to pertinent evidence or information. While Bartlett generally alleged in his motion to appoint that a lock-down at the prison impeded his ability to present his case (R. 303 at 1), he was able to present a reply submission with numerous attachments totaling 109 pages (R. 313). And while he alleges various factual disputes (R. 313 at 1), as discussed above none of those alleged disputes require further proceedings in order to resolve the motion.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that Bartlett's motion to reduce sentence (R. 299) is denied.

**IT IS FURTHER ORDERED** that Bartlett's motion to appoint counsel (R. 303) is denied.

**FINALLY, IT IS ORDERED** that the government's motion to seal (R. 308) attachments 3, 4, 5, and 6 is granted. These medical records are properly maintained under seal pursuant to General Local Rule 79(d) (E.D. Wis.).

Dated at Milwaukee, Wisconsin, this 9th day of June, 2020.

s/ Lynn Adelman  
LYNN ADELMAN  
District Judge
